[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

appear to us that they had been delivered to the lessee's administrator.    The main point in the charge being right, the others do not require to be considered.

Judgment affirmed.

# The Commonwealth, for Use of Lawson, *versus* The Ohio and Pennsylvania Railroad Company.

1. If a court err in rejecting a witness, the error is cured by subsequently admitting him to testify.

2. A pardon, although stating the date of a conviction incorrectly, is sufficient to restore the competency of a witness, if it is possible to show that it was intended to cover and does cover the offence of which the record shows the witness to be guilty.

3. It is a question for the court below to determine upon all the facts before them, whether a pardon is a remission of the offence charged, and not the subject of review.

4. An agreement between the informer and the witness to share the money to be recovered in a *qui tam* action, renders him incompetent to testify in the suit, but his competency may be restored by a rescission of the contract before suit brought.    If rescinded after suit brought, his liability for costs would still render him incompetent.

5. When the interest of a witness is collateral, his competency may be restored by a release or transfer of it.

6. The rule in *Post* v. *Avery*, applies only to persons who have assigned *choses in action*, on which the recovery would have been for their own use, if no assignment had been made.

7. The rule in *Post* v. *Avery*, is not levelled against interested witnesses, but is founded in the policy of stopping a disinterested party from testifying in favor of one who sues in his right.

8. A servant of a corporation who does an act forbidden by law, is responsible for it in his own person; and the corporation is not presumed to have given him any authority to do such an act.

9. When a conductor on a railroad pays out an illegal note in change to a passenger, the penalty cannot be recovered from the company, without proof that he had the authority from the president, directors and treasurer, or some of them to do it; and this authority may be inferred from circumstances.

10. An open and notorious custom of all the ticket agents and conductors employed by a railroad company, to pay out illegal notes in making change to passengers, is evidence that should be left to a jury, to enable them to determine whether the custom was authorized by the company.

11. The managers of a railroad company are presumed to know as much about the conduct of their agents as is known to everybody else; and if they know that their agents were accustomed to pay out illegal notes in making change to passengers, this is an approval of the acts done, and the corporation is responsible.

ERROR to the District Court of *Allegheny county.*

This action was brought against defendants, to recover certain penalties alleged to have been incurred by them, for paying out notes of an amount less than five dollars, issued by banks of other States, contrary to the provisions of the 48th section of an Act of Assembly of this Commonwealth, entitled "An Act regulating.

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

Banks," approved April 16, 1850. The notes were passed by the conductors and ticket agents of the defendants, in their cars and ticket offices, on that part of their road lying within the Commonwealth of Pennsylvania, in the course of their employment, in giving change for notes of a larger denomination received by them in the payment of fare for travelling on said road. In support of the issue on the part of the plaintiff, there was offered the deposition of A. Morris, to which defendants objected, on the ground that the witness had been convicted and sentenced for conspiracy, in the Court of Quarter Sessions of Allegheny county, at December Term, 1853; and in proof thereof, offered the record in evidence. The objection was sustained, the deposition rejected, and at instance of plaintiff's counsel, a bill of exceptions sealed. The plaintiff then offered a pardon to the witness by William Bigler, Governor of the Commonwealth, to which defendants' counsel objected. The objection was overruled, and the evidence admitted, and, at the instance of defendants' counsel, a bill of exceptions sealed. The plaintiff again offered the deposition of Morris, and in connection therewith, the notes referred to in a certain schedule accompanying and making part of the deposition, to which defendants objected, for the reasons that he had an interest in the result of the suit, which had not been divested, he having had an arrangement at one time with the plaintiff to share in the amount recovered; also that the evidence is irrelevant, as showing merely a violation of the law by sundry special agents of the defendants at the instance, and by the procurement of the plaintiff and the witness, and without any evidence of authority from the corporation; also that a part of the evidence offered was secondary, the schedule having been copied by plaintiff's attorney.

The objections were sustained, and, at the instance of plaintiff's counsel, a bill of exceptions sealed. The plaintiff then offered David F. Davis as a witness, to prove that the notes declared on were paid out by the conductors and ticket agents of defendants in the course of their employment, in their cars and at their different ticket offices, on the line of their road lying within. this Commonwealth, and within one year before the bringing of this action. And further, that it was the open and notorious custom of said agents, in the course of their employment, to issue and pay out notes of a similar description to those set forth in the declaration : to all of which offers defendants' counsel objected, and the objection was sustained, and, at the instance of plaintiff's counsel, a bill of exceptions sealed. The plaintiff having then declined to offer any further evidence, the court charged the jury that the plaintiff had not made out his case, and that the defendants were entitled to a verdict. Verdict accordingly.

The plaintiff assigned the following errors.

1. The court erred in adjudging Morris to be incompetent, on account of the conviction and sentence for conspiracy.

2. The court erred in rejecting the deposition of Morris, accompanied with the notes referred to therein.

3. The court erred in rejecting the offer of plaintiff, that the notes declared on were paid out by the agents of the company in the course of their employment, and the custom of said agents to pay out notes of a similar description.

*George P. Hamilton* for plaintiff in error.—*As to the matters involved in the first bill of exceptions.* It has been repeatedly decided that a conviction of *treason, felony,* or the *crimen falsi,* renders a witness incompetent. "But the extent and meaning of the term *crimen falsi* in our law, is nowhere laid down with precision." 1 Greenleaf, Ev. § 373; 11 Metcalf, 302. "In the Roman law, from which we have borrowed the term, it included not only forgery, but every species of fraud and deceit." "But it is clear that the common law has not employed the term in this extensive sense, when applying it to the disqualification of witnesses, because convictions for many offences, clearly belonging to the *crimen falsi* of the civilians, have not this effect." 1 Greenleaf, Ev. § 373.

The true rule for excluding witnesses because of infamy, is that "the *publicum judicium* must be upon an offence implying such a dereliction of moral principle, as carries with it a total disregard to the obligation of an oath." 1 Greenleaf, Ev. § 373; 2 Dodson's Reports, 186. And it is now settled that it is the *offence* and not the *punishment* that creates *infamy.* Gilbert, Ev. 256; Bull. N. P. 292. The great difficulty in determining what offences reflected so much odium upon the perpetrator, as to justify the conclusion of his "total disregard to the obligation of an oath," has, in England, led to the entire abolishment of objections to witnesses on the ground of crime or infamy; 2 Saunders on Pleading and Ev. 1275; 1 Archbold's Crim. Prac. 155; Statute 6 and 7 Vic. 6, 85, § 1; and similar statutes have been passed in many States here.

The term *crimen falsi* is defined differently by different writers. Wharton, in his Law Dictionary, defines it as "the offence of forgery." This definition, however, is too limited; it would not seem to meet all the cases that have been supposed to come within the term.

In 2 Stephens, N. P. 1721, 1722, is to be found the fullest enumeration of offences, conviction of which, at common law, was followed with *infamy.* And in that enumeration, but three classes of cases occur that bear upon the question for argument here, and those three are, first, "*Conspiracy to procure the absence of a*

*person summoned as a witness on an information against the revenue law;*" second, " *Conspiracy to accuse another of a capital offence;*" and, third, " *A person convicted on an indictment for any other species of conspiracy.*" The first was held to be an *infamous* offence in *Bushell* v. *Barrett,* 21 Eng. Com. Law, 483, —a case where the witness, who was held infamous, had been convicted of a conspiracy to *bribe* a person not to appear, after being regularly subpœnaed in a cause depending;' " the essence of the offence of which the witness is convicted, is the attempt to prevent the course of justice, and that by *corrupting a witness.*" And the only case there cited to support the charge of infamy, was that of *Claney,* in Fortescue's R. 208, where "a conviction of *bribing* a witness to absent himself and not give evidence, was held to be an infamous offence by seven of the judges, and for that reason rendered the party incapable of giving evidence;" Holt, C. J., then doubting the propriety of the decision. *Commonwealth* v. *Shaver,* 3 W. & S. 342. The offence, in both cases, being that of obstructing and perverting the administration of public justice by means of *bribery*—an offence not alleged against the witness, Morris.

The second class of cases was held infamous. 2 Hale, P. C. 277. But the conviction of a capital offence incurred death, and, therefore, it might well be held, that a *conspiracy* to accuse of so grave an offence, should be punished with *infamy.* But the principle asserted here, applies not to the *conspiracy* of which Morris was convicted.

The third class of cases would, at first view, seem sweeping enough to cover every conspiracy. But Mr. Stephens cites only one case under this class, to wit: *Rex* v. *Pridle,* Leach, C. C. 496 ; and in that case it is not stated what the conspiracy was, the presumption being that it was a conspiracy to accuse of a capital offence. Starkie, in 1st vol. Ev. 94, after citing the *Pridle case,* in a note, says: "But this, it has been said, is to be understood of a conspiracy to charge a person with a *capital* offence, in which case, upon conviction, he is liable to the villainous judgment and lose the freedom of the law." And Russell on Crimes, 973, 2d vol., asserts the same principle: "*A witness is disqualified by attaint of conspiracy at the suit of the King;*" but he expressly limits the principle to " *a conspiracy to accuse another of a capital offence;*" and Roscoe, (Crim. Ev. 137,) also asserts that "a conviction for a conspiracy does not appear in all instances to have that effect;" that is, the effect of disqualifying a witness. " Sir William Scott, sitting in the high Court of Admiralty, received the testimony of a person who had been convicted of a conspiracy to *defraud,* there being *no* decision in the courts of common law that such person was an incompetent witness." *Ville de Varsovie,* 2 Dodson,

174; *Utley* v. *Merrick*, 11 Metcalf, 303; and in *Crowther*, v. *Hopwood*, 14 Eng. Com. Law, 149, Abbott, C. J., admitted such a person's testimony. It must, therefore, follow that the *offence* cited by Stephens, and founded upon *Pridle's case*, is not so strong as would appear at first view. Subsequent explanations, exceptions, and decisions, cover much broader ground than the *Pridle case*, and clearly limit the rule there asserted, only to conspiracies charging a capital offence; and, without these exceptions, the case would render conspiracies to commit the most trifling misdemeanors, subject to *infamy* as a punishment—a rule that would be attended with consequences wholly répugnant to the genius and spirit of our law.

In England, formerly, whole juries were composed of rude and illiterate men; and hence that extraordinary, technical, and artificial, system of excluding testimony, which was then formed. But as jurors have become more capable of exercising their functions intelligently, courts, both in England and in this country, are struggling constantly to open the door wide as possible; aye, to unhinge it, in order to let in all facts calculated to inform the minds of jurors in arriving at correct conclusions. Hence the statute of 6 & 7 Vic., removing all objection to testimony on the ground of infamy, and the adoption of similar statutes in Connecticut, Michigan, Ohio, and other States in this country.

In *Scott* v. *Commonwealth*, 6 S. & R. 224, it is expressly decided that an *attempt* to commit an offence, shall *never* be punished more severely than the perpetration of it. And in *Hartmans* v. *Commonwealth*, 5 Barr, 60, Gibson, C. J., held that a conspiracy was even *less* than an *attempt*, and that it was wrong to impose on it a greater punishment than the law had annexed to the offence itself. And as *infamy* is one of the most terrible punishments known to the law, it must follow, from the cases just cited, that such punishment attaches only to such conspiracies as contemplate the commission of an *infamous* offence. But we find no cases at common law that warrant *infamy* as a punishment for conspiracies, save those referred to by Stephens, and, as they do not apply to the case at bar, we must look elsewhere than to the common law, in order to determine the question raised here.

Bribery is not an infamous offence here. *Commonwealth* v. *Shaver*, 3 W. & S. 220. And therefore conviction of a conspiracy to *bribe* could not, under the case of *Hartmans* v. *Commonwealth*, be punished with infamy. Nor is "the attempt to procure the absence of a witness for a criminal prosecution" an infamous offence. 8 Verm. 57, U. S. Dig., vol. 5. And in *Utley* v. *Merrick*, 11 Metcalf, 302, it is expressly ruled that a conviction of the offence of *cheating* by *false pretences* does not render the party infamous; and it must follow, according to the rule

established in the *Scott* and *Hartman cases*, that conspiracies to procure the absence of witnesses, or, cheating by false pretences, are not infamous offences. Again: "It has been wisely said that it is difficult to define the offence of conspiracy at the present day." Lewis, U. S. Criminal Law, 219. And whatever may have been the punishment therefor at common law, Chief Justice TILGHMAN has said, in *Scott* v. *Commonwealth*, many offences punished in England by infamous infliction had not been so punished in Pennsylvania, and that he would not be willing to expose any citizen to infamous punishment for undefined crimes.

Apply the principles deducible from the foregoing, to the conspiracy here in question, and what is the result? The first, second fifth, eighth, tenth and eleventh counts of the indictments in evidence, charged a conspiracy to procure the violation of a statute that prescribes fine and liability to *qui tam* actions, as the punishment for infractions thereof, and the offences charged *cannot* be *infamous*, according to the *Scott* and *Hartman cases.* If otherwise, "a greater punishment than the statute annexes to the offence itself," could be visited upon an *attempt*, or *conspiracy* to commit the offence. The third count charges a conspiracy to cheat and defraud the county of her moneys, revenues, &c. But cheating and defrauding do not constitute an offence punishable with *infamy* at common law; case of *Ville de Varsovie*, 2 Dodson, 174 ; *Crowther* v. *Hopwood*, 14 Eng. Com. Law; nor under the statute, 11 Metcalf, 302, the Massachusetts statute being copied from the English. At common law, cheats could be effected only by "false weights, false measures, false tokens, or the like, calculated to deceive numbers." 1 Bouvier, 258 ; 2 Barr, 1125; 1 W. Bl. Rep. 273; Holt, 354. And this third count does not meet the requirements thus made.

But if, under the statute of George II., c. 24, which extends the common law offence, and as adopted in Massachusetts, *infamy* does not attach to the offence itself, it cannot attach to conspiracies to commit the offence ; for conspiracies are not punishable greater than the offence itself. *Hartman's case,* 5 Barr, 60. In *Collins* v. *Commonwealth*, 3 S. & R. 220, the conspiracy charged was within the common law rule, for there the charge was, that the conspirators had been guilty of cheating by "*false pretences*," "and *false, illegal* and *unauthorized* paper writings, in the form and similitude of bank notes." But this case does not prove the conspiracy charged to have been *infamous*, nor is it so decided. The statute of 1842 covers the case, and punishment under that statute cannot work infamy, according to the principle in 11 Metcalf. But the county of Allegheny was *not* cheated and defrauded ; and, to punish an alleged attempt to cheat and defraud, would be visiting upon an unexecuted intention a greater punishment than the law would fix upon a success-

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

ful act, which is said to be absurd in *Rogers* v. *Commonwealth,* 5 S. & R. 464; 9 Cowan, 578, 593.

The sixth count charges a conspiracy to extort money from the president, &c., of the Farmers' Deposit Bank. But extortion, in its legal sense, is not an *infamous* offence; or, at least, it is not defined as such in any of the books. Under our statute, extortion would seem to be an offence known only to the sphere of public officers of the law, and even there it is not held to be *infamous.* In a popular sense, the offence is less criminal than in its legal sense, and in neither sense has it ever been held infamous. Such being the case, it remains to be seen whether, in this case, and in order to gratify a corporate power, a precedent shall be established that will conflict with the tendencies of the law, and enlarge the class of offences hitherto denominated as *crimen falsi.*

On the other counts of the indictment, judgment was arrested. It remains, therefore, but to inquire, whether the general rules will embrace the offence alleged in the indictment. Does the offence of such conspiracy imply "such a dereliction of moral principle, as carries with it a conclusion of a total disregard to the obligation of an oath?" Are those who are convicted of such offence "thereby rendered morally too corrupt to testify?" The cases upon which the rule is predicated do not meet the offence here alleged, and, therefore, unless the rule be enlarged, with prejudice to the law, the exception to the ruling of the court below must be sustained. Morris was not convicted of any offence comprehended within the case of *Bushell* v. *Barrett; Claney* or *Pridle;* and, as they embrace all the matter rendering conspiracies infamous, it must follow that we are without authority to adjudge him *infamous.* In *Ville de Varsovie's case; Crowther* v. *Hopwood,* and *Utley* v. *Merrick,* the only question that raises the least doubt, is decided, to wit: that cheating is not an infamous crime, and, therefore, applying the principle recognized in *Hartman's case,* conspiracies to cheat cannot be held infamous.

*As to the objection that the witness, Morris, was incompetent from interest.*—The interest of the witness should clearly appear; and if it be in the least degree doubtful, the court ought not to decide the question. *Hart* v. *Halner,* 3 R. 407; *Martin* v. *Jones,* 6 Barr, 82.

The cases have got back to the common law rule, which is, that all who have no interest in the subject-matter of the suit, when called to testify, are competent, except they be parties to the action. *Taylor* v. *Gitt,* 10 Barr, 428; *Orphans' Court* v. *Woodburn,* 7 W. & S. 162; *Cameron* v. *Paul,* 6 Barr, 322.

Morris is not a party to the action. Before it was brought, there was an arrangement between Lawson and him, by which he was to participate in the recovery; but that agreement was can-

celled before the witness was examined. The motive or the object of cancelling the arrangement, is immaterial, if the effect of it was to divest the witness of all interest in the result of the controversy. When the interest is proved by the witness himself on his examination, it may be disproved in the same way.

Conceding that the witness has an interest in the result of the suit, would it disqualify him? It is no objection to the competency of a witness, that he may be entitled to a reward on the conviction of the prisoner. *United States* v. *Wilson and Porter*, Baldwin, 78.

The right to a reward, or to the restitution of the goods stolen, as owner of them, or to a portion of the fine or penalty inflicted, is not a valid objection to the competency of a witness. Greenleaf, sec. 412.

The nature and object of rewards and pecuniary penalties are the same,—the punishment and suppression of offences against the laws and policy of the State, with a view to the public good. When the benefit resulting to the witness is created chiefly for his own sake, and not for the public good, he is incompetent. But where the infliction of a fine or penalty is intended as a punishment, in furtherance of public justice, rather than as an indemnity to the party injured, the person benefited by the conviction will be competent. Greenleaf, sec. 412.

To exclude a person from being a witness, in suits under this statute, because that he is entitled to the penalty, would go far towards defeating the object of the legislature, by lessening the means of conviction. Where the right to sue, and, consequently, to the penalty, is ambulatory, it cannot be said that the penalty is in the nature of indemnity to the party injured. No one member of the community can be said to be injured more than another, by the violation of that statute.

*As to the objection that the evidence is secondary.*—" Whether evidence is primary or secondary, depends upon the nature of the case in the abstract, and not upon the peculiar circumstances under which the party, in the particular case, may be placed." Greenleaf, Ev. sec. 84.

Where the proposed evidence indicates that there is better behind, in the power of the party, it is secondary. Greenl. sec. 82.

The essential facts of the case are proved by the witness without reference to the notes or schedule. The gist of the action is, the paying out or passing, in this Commonwealth, foreign bank notes, of a less denomination than five dollars, within two years before the institution of the suit. He states that the notes in question were paid out by conductors and ticket agents of the company, in the cars and offices of the company, on the route of their road lying within the Commonwealth, between the middle of August and November, 1853. The time, place, or person,

whether Davis or himself, to whom any particular note was paid, he cannot state, without reference to the marks on the notes, or copies of those endorsements contained in the schedule before him, and annexed to his deposition.   The schedule of the notes, with the endorsements on them, was prepared in the presence, and under the immediate supervision of the witness, and was resorted to as a matter of convenience, and to facilitate the taking of the testimony.   The rules of pleading and evidence have been made to yield to public convenience in the administration of justice, where the facts are voluminous, or the matters pleaded tend to infiniteness and multiplicity.   Greenleaf's Ev., sec. 93 ; Stephens on Pleading, 359, 360.

Whether evidence is primary or secondary, is to be determined by the state of the case when it is offered to the jury, and not when the deposition of the witness is being taken.   The schedule was not offered in evidence, by itself and in substitution of the notes and endorsements, but all were offered together.   A witness may refresh and assist his memory by the use of a written memorandum, and it is not necessary that the writing should have been made by the witness himself, nor that it should be an original paper, provided, after inspecting it, he can speak to the facts from his own recollection.   The witness made the endorsements on the notes when the facts were fresh in his recollection, and states that the facts therein mentioned were correctly stated. Greenleaf, sec. 436.

The schedule was, in effect, made by the witness himself, for it was done in his presence and under his immediate supervision.

The witness having stated that he made the memoranda at the time the facts occurred, and that they were accurately reduced to writing, they should have been admitted to go in evidence. *Bank* v. *Borœf*, 1 Rawle, 152 ; *Smith* v. *Love*, 12 S. & R. 84; *Stall* v. *Rames*, 2 Nott & M'Cord, 331 ; *Clark* v. *Vorce*, 15 Wend. 193 ; 16 Wend. 586, 596, 597, 598.

The execution of a paper may be proved without the production of it, or accounting for its non-production.   If produced on the trial, a question may arise as to whether the paper is sufficiently identified or not.   When a paper is shown to a witness merely to prove handwriting, the other party is not entitled to see it.   *Sinclair* v. *Stephenson*, 1 C. & P. 582.

What advantage would the production of the notes before the examiner have been to the defendant?   The schedule itself afforded the same facilities and opportunities for cross-examination as the notes themselves and endorsements thereon would have done.   The notes were identified by the usual description, such as the name of the bank, denomination and number, and the endorsements made by the writers were literally stated in the schedule.   Thus the party had an ample opportunity of establish-

ing a variance between the declaration and the proof, in all matters of essential description.

*As to the liability of the company for the acts of their conductors and ticket agents, in violation of the statute.*—"In general, the only mode in which a corporation aggregate can act or contract is through the intervention of agents, either specially designated by the act of incorporation, or appointed and authorized by the corporation in pursuance of it." Angell & Ames on Corp. sec. 276.

The stockholders, even all of them, at a general meeting, cannot bind the corporation by contract. Their action can only be advisatory. *Ins. Bank Columbus* v. *Bank U. S.*, 7 P. L. J. 129.

The directors are but agents of the corporation. Angell & Ames, sec. 299.

If, therefore, a corporation aggregate must act by agents, it follows, that whatever responsibilities it may incur, whether arising from contracts, or the violation of its charter, or the general law, must be incurred through the same instrumentality, or not at all. The persons who paid out these notes acted publicly as officers of the company. *M'Gargill* v. *Coal Company*, 4 W. & S. 424.

The appointment of an agent may be implied from the permission or acceptance of his services, or, in general, from being held out as an authorized agent of the corporation. Angell & Ames, sec. 284.

The plaintiff's offer of evidence went to prove that they were agents, *de facto* of the company. The principal is liable, in a civil suit, to third persons, for the frauds, deceits, concealments, misrepresentations, torts, negligence and other misfeasances and omissions of duty by his agents, in the course of his employment, although the principal did not authorize or justify, or participate in, or, indeed, know of such misconduct, or even if he forbade them, or disapproved of them. Story on Agency, sec. 452; Paley on Agency, 294, 305; 2 Kent's Com. 633; Smith on Master and Servant, 152; Law Library, vol. 75.

"A corporation is liable for the wrongful acts and neglects of its servants and agents, done in the course and within the scope of their regular employment, upon the same grounds, in the same manner, and to the same extent that natural persons are." Angell & Ames, sec. 310; 9 S. & R. 94; *Albert* v. *Savings Bank of Baltimore*, 1 Mary. Ch. 407; *Thatcher* v. *State Bank of N. Y.*, 5 Sandford, Sup. Ct. R. 121; *Bank Columbus* v. *Patterson*, 7 Cranch, 299; *Smith* v. *Birm. & S. Gas Co.*, 1 Ad. & El. 526; 2 Kent's Com. 290; *Maund* v. *Monmouthshire Canal Company*, 4 M. & G. 452; *Crump* v. *U. S. Mining Co.*, 7 Grattan (Va.) R. 352.

"In its relation to the government, and when the acts and

neglects of a corporation, in violation of its charter or of the general law, become the subject of public inquiry, with a view to the forfeiture of its charter, the wilful acts and neglects of its officers are regarded as the acts and neglects of the corporation, and render the corporation liable to a judgment or decree of dissolution." Angell & Ames, sec. 310; *Life and Fire Ins. Co.* v. *The Bank,* 7 Wend. 35; *The Bank* v. *Bank of Buffalo,* 6 Paige, 697; *Ward* v. *Sea. Ins. Co.,* 7 Paige, 294.

These agents had a general authority in regard to the particular business for which they were employed. "By a general agent, is understood, not only a person substituted in the place of another for transacting all manner of business, but a person whom a man puts in his place to transact all his business of a particular kind." Dunlap's Paley's Agency, 99, and notes.

Limiting the agency to a particular business, does not make it special. It may be as general, in regard to that, as if the range of it was unlimited: *Anderson* v. *Coomly,* 21 Wend. 279.

An agent to sell a particular thing, without any reservation as to terms, is a general agent; *Jeffrey* v. *Bigelow,* 13 Wend. 518.

The officers and agents were acting in the course and within the scope of their employment, in paying out the notes, whereby it is claimed that the company became liable. It was their ordinary business to collect the fare from travellers on the road, and this often involved the necessity of making change. It was in making change, that the notes in question were paid out. These acts were ostensibly in fulfilment of a lawful official duty devolved on the agents of the company. What the agents did, was not in excess of their power, but in abuse of it. The agents were not authorized to pay out, by way of change to the traveller, counterfeit money; but, suppose they had done so, would it be pretended that the company was not bound to make restitution in a civil action? Or, suppose a conductor, without cause, thrust a passenger out of the cars, would not the company be civilly liable for the trespass, although they did not authorize their agent to commit it, or ratify the act after it was done? It is sophism to say that the company's agents were not agents to issue or pay out the notes in question; that the corporation, itself, had not the power, and therefore that there could be no derivative power to do it! The doctrine amounts to this, that no principal can ever be made liable for the wrongful acts of his agent: because he was not appointed to commit wrongs, and cannot rightfully do so! The company had the power to issue and pay out these notes. The power is clearly implied from the prohibition of the statute, and the penalty imposed for the violation of it.

The open and notorious manner in which the agents of the defendants passed and paid out these small notes, should cast on the company the *onus* of proving that it was done without the

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

authority of the directors. The notoriety of the act is *prima facie* evidence that it was done by the authority of the directors, or received their ratification. The acts and.conduct of the principal are construed liberally in favor of the agent. Story on Agency, sec. 253. "Slight circumstances and small matters will sometimes suffice to raise the presumption of ratification." Ib. Where an agency exists, the mere acquiescence may well raise the presumption of an intentional ratification of the act. Ib.

*Thomas Williams and W. S. Courtney* for defendants in error.

1. The counsel for the defendants in error, in answer to the first assignment of error, which relates to the exclusion of the witness, Morris, on the ground of infamy, and for the purpose of showing that the offence of which he was convicted was such as would destroy his competency, will refer to and rely on 1 Greenl. Ev. sec. 373; 1 Hale's P. C. 306; 2 Id. 277; 2 East's C. L. 838; 1 Hawk. P. C. 182; 2 Ld. Raymond, 1461; *Lewis* v. *Commonwealth*, 2 S. & R. 552; *Collins* v. *Commonwealth*, 3 S. & R. 220; *Rogers* v. *Commonwealth*, 5 S. & R. 463; *Commonwealth* v. *Shaver*, 3. W. & S. 338, 342; *Hazen et al.* v. *Commonwealth*, 11 H. 355; Act of 5th April, 1790, sec. 4.

2. In defence of the second error, which respects the interest of the witness and the subject-matter of his deposition, they will, on the former question, refer to the deposition itself, to show that the services and testimony of the witness were hired for the occasion, by an agreement on the part of the plaintiff to divide the plunder with him on the entire and successful accomplishment of the purposes of the confederacy: and on the latter, to the following authorities:

To show that a witness cannot refresh his memory by any paper not in his own handwriting, and made at the time of the transaction to which it refers. 1 Greenleaf, Ev. sec. 438; *Jones* v. *Stroud*, 2 C. & P. 196, (12 E. C. L. R. 524;) *Steinkiller* v. *Newton*, 9 C. & P. 313, (38 E. C. L. R. 129;) *Maegoe* v. *Simmons*, 3 C. & P. 75, (14 E. C. L. R. 457.)

That after inspecting the paper he must speak from his own recollection. 1 Greenl. Ev. sec. 436.

And that although the writing must be produced when the witness, without any independent recollection of the facts, remembers that at the time he saw it, he knew the contents to be correct, it is not thereby made evidence. 1 Greenleaf, Evid. sec. 437.

3. It is not disputed that corporations aggregate must act generally through the intervention of agents, or that the ticket agent and conductor were agents *de facto* of the defendants; or that, as stated by Story in the passage cited, "the principal is liable *in a civil suit* for the torts and other misfeasances of his agent

in the course of his employment, although the principal did not authorize or even know of such misconduct," without the qualification, however, which the counsel for the plaintiff has omitted to quote from the same section ; that it is a general doctrine of the law that "the principal is not ordinary liable in a criminal suit for the acts or misdeeds of his agent, unless he has authorized or co-operated in those acts or misdeeds." And it is to be observed, moreover, that the reason assigned for the rule in the same section is because " in no other way could there be any safety *to third persons*, in their dealings, either directly with the principal, or indirectly with him, through the instrumentality of agents. In every such case the principal holds out his agent as competent and fit to be trusted, and thereby in effect he warrants his fidelity and good conduct in all matters within the scope of his agency."

Here, then, is the rule, with its limitations and its reason. The liability is a merely civil one, and its ground the credit which the principal gives to his agent by the mere fact of his employment, in " his dealings with third persons."

In the present case, the liability sought to be enforced is *quasi* a criminal one, for the commission of an indictable offence, where no third person was injured by a misplaced confidence, and where the party dealing with the agent, instead of being misled as to his powers, and trusting him upon the footing of appearances, was perfectly aware that he was abusing his trust by offending against the law, and was in point of-fact inviting and tempting him, for his own wicked and mercenary purposes, into the perpetration of the very act which he now claims to have been done by virtue of an authority which he had a right to imply.

But the rule above stated from Story on Agency, sec. 452, is followed up more distinctly in sec. 456, by cautionary remarks. And the same doctrine is affirmed in the case of *The Philadelphia R. R. Co.* v. *Wilt*, 4 Whar. 133 ; and *Bradley* v. *Snodgrass*, (error to Allegheny county,) which is not yet reported.

It is to be remarked, moreover, that in the example put by Story, as well as in the Pennsylvania cases referred to, we are furnished with a solution of the question as to what is meant by the terms of limitation, or in other words, " the *course* of the agency," and " the *scope* of the agency." The case in 4 Wharton was that of a rail road engineer, and that of *Bradley* v. *Snodgrass*, a stage driver—both in the exercise of their proper functions or employment at the time when the mischief was done. But they are not alone. The case of *Hackney* v. *The Allegheny County Mutual Insurance Co.*, 4 Barr, 185, where it was held that the company was not bound by the false representations of its agent while receiving applications for insurance, although similar representations were made to him by the president at the time of

his appointment, because they were not acts within the scope of his agency, is of the like character.

It is clear, therefore, that the terms have never been understood to import that it is only necessary that the agent should be engaged at the time in and about the business of the principal. They mean, of course, something more, and that something must be the honest performance of his duty by the use of such means and instrument as he might *lawfully* use and would reasonably require.

In this case, however, the offending parties were ticket agents and conductors—not *disbursing*, but *receiving* agents—with no necessary authority to pay out money, and no express authority pretended to pay out an illegal currency, and sinning against the law, not through mere negligence, but *wilfully*. If the wilfulness of the act will exonerate the master in the one case, on the ground that the servant is not in the *course* of his agency or acting within its *scope*, when he is transcending his duty and knowingly violating the law, there is no conceivable reason why it should not in the other. Nor would it in either case be in conformity with the charitable presumptions of the law to imply an authority to commit a palpable wrong. If the law will not presume a fraud *a fortiori*, will it not an indictable misdemeanor? If it makes the principal answerable for the fraud of his *agent*, it is only upon the footing of the *credit* which the commission gives him in his *contracts* or dealings with third persons.

Then as to the corporate character of the defendants. It was for a long time doubted whether a corporation could be held answerable for a *tort* at all, and although the law is now settled otherwise, upon reasons which are entirely satisfactory to the profession; there is still something in the corporate character to distinguish the case from that of an individual. Thus in the case of *M'Cready* v. *The Guardians of the Poor*, 9 S. & R. 101, which was *traspass* for *mesne* profits, the late Justice Duncan, in affirming the liability, remarks: "I do not say that a corporation would be responsible in trespass, for every outrage committed by their servants or agents. The act must appear to be done by their authority, not express, but implied *from its own nature*, in the prosecution of some corporate claim, in the exercise of some corporate right, and in such case where the act done would be within the scope of corporate claims, it would not be necessary to show the authority or mandate under the corporate seal."

The general principle, however, as to the liability of a corporation for the acts of its officers, is thus stated by Angell & Ames, 250, 251.

And therefore, in the case of *Thayer* v. *Boston*, 19 Pick. 516, where the same rule was laid down in *totidem verbis*, the court rested the liability on the doubt which might exist in a given

case whether the act done was really lawful or unlawful, as will be shown by the opinion of the court in that case.

And so, too, in the case of *Wyman* v. *The Hallowell and Augusta Bank*, 14 Mass. 58, wherein it was held that a banking company incorporated by the same name with a previous one, and the same president and cashier, receiving and issuing the notes of the former company, was not liable thereupon, although the officers declared repeatedly that there was no difference between the notes of the old and new companies.   *Salem Bank* v. *The Gloucester Bank*, 17 Mass. 29.

And in conformity with these principles is the case of *Fox* v. *The Northern Liberties*, 3 W. & S. 103, wherein it was held that an incorporated district was not liable, in trespass, for the illegal seizure of the plaintiff's horse, by one of its officers, for an alleged violation of one of its ordinances, when, in fact, no such violation took place, unless the corporation previously authorized or subsequently ratified the seizure."

So, also, in the case of *The Hazleton Coal Company* v. *Megargel*, 4 Barr, 324, which was an action against the company for issuing a promissory note, in the nature of a bank note, under the Act of 22d March, 1817, where the signature of the president had been proved.

And again in the case of *Lloyd* v. *The West Branch Bank*, 3 Harris, 172, which was an action to recover the amount of a special deposit of Tide Water Canal notes, placed by the plaintiff in the hands of the cashier, it was held that, if made without the permission or knowledge of the directors, the defendants were not responsible therefor.

Here, then, is Pennsylvania authority, which would seem to be conclusive, upon the question.   There are two cases, however, out of our State, which are so much to the purpose of the present inquiry as to entitle them to a decisive effect in the character of authorities.

The first is the case of *Vanderbilt* v. *The Richmond Turnpike Company*, 2 Comstock, 479, where the plaintiff's boat was run into and damaged by the wilful act of the captain of the defendant's boat, and it was held that the corporation was not liable for the trespass, although the act was authorized and sanctioned by the president and general agent thereof.

The other, which is in all its features the very counterfeit presentment of the case in hand, is that of *William H. Clark* v. *The Metropolitan Bank*, 3 Duer, 241.

But it is admitted, in plaintiff's argument, that the special business of the defendants' agent was the sale of tickets and the collection of fares.   This operation, it is asserted, involved the necessity of " making change," and it was in so doing that the notes in question were paid out.

If it were true, however, that the special duty did involve the necessity supposed—which it clearly did not, as a *necessity*—what would be the presumption as to authority, and what the duty of the agent in the absence of any specific instructions upon the subject? The law never presumes a wrong, and the duty of the agent would be, not to violate the law, but to conform to it by the payment of nothing but lawful money.

It is not pretended that there was any *express* authority, nor was any positive knowledge attempted to be shown in the present case. The process by which it was sought to charge the defendants, was by an *inference*—and that, not from any given fact, but from another *inference*—implying *knowledge* from *publicity*, and *authority* from *knowledge*. One would suppose that somewhat better evidence might be reasonably expected to establish a *criminal* charge involving such tremendous responsibilities, and such ruinous consequences.

It seems to be forgotten, moreover, that there was no evidence to show that any of the notes paid out were even the property of the defendants. They might have belonged to the agent himself. It is not likely that he was provided with them, or even with any money at all by his employers, for that purpose. They appointed him to *collect and receive* only, and he was accountable for what he received, in *money*.

The question is asked, however, whether, if he had paid out counterfeit money, the defendants would not be bound to make restitution in a civil action? Undoubtedly they would, because it would be no payment, and the right to recover the difference would rest on the footing of the *contract*. A more pertinent question, however, would be whether they would be *criminally* liable in the case put, and as the plaintiff's counsel has forgotten to ask that question, perhaps he will have no objection to answer it himself. It will serve, at least, to put him on the inquiry whether he has not confounded the presumptions which are allowed to sustain a *contract* with the higher evidence which is required to establish a grave misdemeanor. Will he assert that, even in the case of *an individual*, the fact of an agent having openly and on divers occasions paid out counterfeit money for the same purpose, would authorize any presumption of authority to implicate the principal in the guilt, or visit him with the punishment, or impose any higher responsibility, under any circumstances, than that of merely repairing the injury sustained by the party who had dealt with him? No lawyer, we think, will venture to say so. And yet this is the case of a *corporate body* whose merely *civil* liability for *damages* in the case of an ordinary *tort* was so recently doubted, and whose exemption from responsibility in the case of "a high public misdemeanor," com-

mitted by one of its members, even *communicato concilio*, is as ancient as the civil and canon laws.   Angell & Ames, 331.

But we are not done with our interrogatories yet.   Suppose, in the case put, that the plaintiff and his witnesses, who were his agents and confederates, and seek to bolster up their case by legal implications which were intended only for the protection of the innocent, had travelled for short distances on the road, and, instead of paying the precise amount of their fare, or as near it as convenient, had invariably tendered much larger notes for the very purpose of *inducing* the agents of the company to violate the law.   Would this be a case out of which the necessity of making change arose in the ordinary course of the agent's employment, or would it be a *special* case of necessity created by the plaintiff himself, for wicked purposes, and with the view of tempting the agent, and seducing him from his fidelity to his principal?   Is there any doubt that the tempter himself, as the *procurer*, would be, at least, *morally* responsible for the consequences of his act, and if a mere implication of authority is to be resorted to for the purpose of finding a responsible principal, would it not arise more directly and naturally against him than against the general employer, whose agent he was enticing, in his absence, without his knowledge, to do what he himself knew to be a violation of the law, and what he equally well knew could not have been approved by him without ruin to himself?   Can it be said by counsel, who rest their case upon feeble and remote presumptions, that in the case put the conductor was not, at least, *pro hac vice*, the agent of the plaintiff himself?   Would the fact that he had been seduced by others, or that he had sinned of his own inherent depravity, or that he had been even authorized in another case, have amounted to evidence or been admissible even in the way of palliation?   Could the authority, even supposing it shown, to commit one sin be extended by presumption to another, when the occasion therefor was specially ministered by the party claiming upon the ground of the authority?   And would it not be a monstrous perversion of the sound and equitable rule which makes the principal the sponsor for the fidelity of his agent, to hold that the seducer himself should be allowed to profit by the transaction, on the presumption of an authority by which he was neither misled nor injured?

It will not do, therefore, to say that the openness and notoriety of the act are sufficient to cast the burthen of *disproof* on the shoulders of the company.   A case like this is not to be helped out by the "liberal constructions," "*slight* circumstances, and *small* matters," upon which the counsel for the plaintiff in error relies, to throw the onus of a *negative* upon the company.   "Liberal constructions" are not usual in penal actions.   *Slight* circumstances can acquire no adventitious weight where such alarming

consequences are involved; and "*small* matters" are in such cases, if ever, to be thrown into the limbo of vanity, and treated upon the sensible principle of "*de minimis.*" He reads amiss, and turns a healthful nutriment into poison, who converts the principles cited to such base uses as these.

Nor is there any thing in the argument that, on a public inquiry, with a view to the forfeiture of the charter, the wilful acts and neglects of the officers are regarded as the acts and neglects of the corporation. If the law were even so, which is not conceded, it would not help the case. The legislature, in creating a corporate body, may confer the privilege on its own terms, and withdraw it upon the smallest violation or neglect of the conditions, either express or implied, whether it be wilful or otherwise. It is one thing, however, to withdraw the franchise for the default of the officer, and another to confiscate the property of the inncocent stockholder for the same reason.

Nor is it required of the defendants to assume the extreme position, of denying their ability to sin in this particular. Whenever it is shown that the stockholders themselves, in the mode provided for the expression of the corporate will, have unequivocally authorized a violation of the law, it will be time enough for them to take refuge in the argument of their impeccability. They will not be forced to this extremity, however, until a direct authority has been shown, and one, too, which flows from a higher source than even the board of directors or managers, which is entrusted with the general superintendence of the affairs and business of the corporation, and is expected to perform its duties honestly and faithfully under the law and in obedience to its requirements.

The opinion of the court was delivered March 10, 1857, by

BLACK, J.—This was an action against the defendants, (a corporation,) to recover the penalty imposed by statute for paying out bank notes of a less denomination than five dollars. The record raises certain questions, which have been fully discussed by counsel on two occasions, and very carefully considered by all the members of this court. The conclusions to which we have severally arrived are so various, that I must be understood as expressing no more than my own opinion, though I think it probable that a majority of my brethren will concur in the judgment which I would give. I shall take the points in order.

Absalom Morris was offered as a witness by the plaintiff, and, at first, the court held him to be incompetent, on the ground of infamy, he having been convicted of a conspiracy. But he was afterwards offered again, with a pardon from the governer, and he was then adjudged to be competent. The plaintiff took an exception to the decision excluding the witness, and, on the rul-

ing which admitted him, the court sealed a bill for the defendants. In this court, the plaintiff insists, that the witness ought to have been admitted without the pardon, because his crime was not of the class which, by law, disqualifies him. The defendants not only deny this, but assert that it was erroneous to admit him even after the production of the pardon, inasmuch as it does not so recite the record as to show that he was pardoned of the same offence he was convicted of. All this has, from the beginning, seemed to me beside any purpose for which the case can be here. If the court did err in rejecting the witness when first offered, the error was cured by admitting him afterwards. The plaintiff had precisely the same advantage from his witness that he would have had if no error had been committed. To compel him to produce the pardon, was not even a hardship; it was revealing but the simple truth of the case. The fact of the pardon did not go to the jury, but only to the court, and we are asked to reverse the judgment, not because a competent witness was excluded, but because the court insisted upon stronger and fuller proof of his competency than what the law made necessary. I think there never has been, and never ought to be, a reversal for such a reason. If the court supposes a witness to be interested, and rejects him, and the same witness being afterwards offered, with a release, is admitted and gives his testimony, could the party who introduced him assign his first rejection for error? Certainly not. If we should reverse on this ground, what reason would we give? not the exclusion of the witness, for he was not excluded; not the reading of the pardon, for that was the act of the plaintiff in error himself; not the admission of the witness, for that was surely no fault of the defendant.

I have said that the question of the witness's competency, on the score of infamy, is not raised on this record; and it is certainly not our duty to say anything on the subject. But as other members of the court probably think differently, and as, on a new trial, it may become very important, I will take leave to express the opinion, that the offence of the witness did disqualify him. As to the pardon, it does not recite the date of the conviction correctly, but that does not render it impossible to show that it was intended to cover, and does cover, the offence of which the record shows the witness to be guilty. If he was convicted but once in his life of any similar offence—if the pardon recites that he was in prison at its date, under the conviction to which it applies, and it can be shown what conviction that was—then it will be mere hypercriticism to pick out a discrepancy in the recital, for the purpose of defeating it. Why should a judge be required to say that it is not a pardon of a particular offence, when he knows in his conscience that it is? It is a question for the court below to determine, upon all the facts before them, whether the

pardon is a remission of this offence or some other ; and it is not, in my opinion, subject to review here. At least, there ought to be no reversal on that ground, unless the record shows a palpable mistake. When the court settled the general competency of the witness, an objection was made by the defendants, grounded on the matter of his deposition, which, it is asserted, disclosed an interest in the case. It appears that the plaintiff and the witness had a contract between them, by which they agreed to get as many small notes as possible, from the defendants and other corporations, and from brokers, and sue for the penalties, sharing the profits between them. If this agreement had continued in full force, and the plaintiff had recovered the penalties, it would, perhaps, give Morris a right to demand from Lawson his stipulated share, and that would be such a direct interest in the event of the suit, as would disqualify him from being a witness. But the same deposition in which we find this fact stated, informs us further, that the contract was rescinded by mutual consent; that the witness's right to any share in the penalties, was abandoned before suit brought, and that the agreement was burnt previous to the time when he delivered his testimony. This drives the defendants to the necessity of setting up the rule in *Post* v. *Avery*. They allege that the witness could not make himself competent by any release of his interest.

When the interest of the witness is collateral, his competency may be restored by a release or transfer of it. The rule in *Post* v. *Avery*, applies only to persons who have assigned *choses in action*, on which the recovery would have been for their own use, if no assignment had been made. Its object is to prevent a party from transforming himself into a witness, by the magic of a bit of paper. It forbids one who assigns a claim to sell his oath along with it. But a person who has a merely incidental interest in the result, an interest which arises entirely out of the fact, that the record may be evidence for or against him in some other action, may divest himself of such interest, and if he does so at any time before he is offered as a witness, his testimony must be received. For instance, a stockholder in a corporation may transfer his stock, and become a witness for the company : a legatee may dispose of his interest in the estate and testify, for the executors : an attorney who has a contract for a contingent fee may release it, and give evidence in favor of his client. The rule in question is not levelled against interested witnesses, but is founded in the policy of stopping a disinterested party from testifying in favor of one who sues in his right. This question was considered and decided in the case of *Hartman* v. *The Insurance Co.*, (9 Harris, 466 ;) and we then refused to carry the doctrine beyond the limits which I have here assigned to it.

It becomes necessary therefore to consider whether the interest

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

which Morris would have had in the event of this suit was collateral and incidental, or whether he owned and transferred to the plaintiff the claim on which suit is brought. He certainly never had any right of action against the defendants, more than what any other person had. He had no vested interest in the penalties which they incurred by passing small notes. Neither had Lawson until he brought suit. Lawson got his interest by becoming the informer, not by virtue of any assignment from Morris. Lawson does not sue in Morris's right, but as purely in his own right, as if Morris had never lived. The contract of Lawson, to share the penalties with Morris, in consideration of Morris's services, in getting up the evidence, if it be a contract enforceable at law, (a point on which we give no opinion,) would give the latter a claim upon the former for the amount agreed upon, but it was collateral, like the claim of an attorney, whose client agrees to pay him a compensation proportioned to the amount recovered. It did not make him a party to the suit, nor vest in him the right of action, but it gave him an interest in the record, because he might use it in an action against Lawson, to recover the share he bargained for.

On the whole, I cannot see that the plaintiff can legally be deprived of the testimony of this witness, on the ground that he was a party, and transferred his right of action to the plaintiff; for he never had any right to the penalty sued for, and of course could not transfer it; Lawson got his claim to it as any body else might have got a similar claim, by the act of bringing the suit and becoming the informer. Neither can the witness be excluded on the score of a present interest in the money to be recovered, for he has wholly divested himself of all interest that he ever had.

What I have said about Morris's interest refers to his interest in the penalty. If that was divested before he was called to the book, it would not exclude him. But his liability for costs stands upon different grounds. If he had a right to part of the penalty, even collaterally, by way of contract with the plaintiff for his services, he is liable for costs, unless the contract was rescinded before the suit was brought. This was decided in *Gallaher* v. *Milligan*, (3 Penn. Rep. 177.) The witness says in effect that the contract was in writing, and he and the plaintiff each had a copy. But it was agreed that the witness should have no further interest in it, and Lawson brought the suit for his own benefit, and on his own responsibility. Lawson gave up his copy of the contract, and the witness destroyed it. All this was before suit brought. But the witness kept the other copy and did not destroy it until after suit brought. If this statement be true the witness's interest was in fact gone before the suit commenced.

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

The court must take it for true in determining the competency of the witness, but the jury may believe it to be false, and if they do they must reject all the evidence he gives, not only on the ground that he is interested, but upon the maxim *falsum in uno falsum in omnibus.*

When the plaintiff and his witnesses entered into the conspiracy, for which they were afterwards indicted and punished, they undoubtedly encountered about as much public hatred and contempt as a mortal man can live under. But, how far this should affect the credibility of the witnesses, is not for us, but for a jury of their country to judge.

The next question is, whether the railroad company is liable for the acts of the ticket agents and conductors. I concur fully in the opinion, that the defendants are not liable under the statute, unless the notes were paid out *by the corporation.* The corporation did not pay out the notes, unless the officers immediately chosen by the stockholders to manage the affairs of the company, either passed them away with their own hands, or else authorized their subordinate agents to do so. A servant of the corporation who does an act forbidden by law, is responsible for it in his own person; and the corporation is not presumed to have given him any authority for such an act. It is very clear from this, that where a conductor pays out an illegal note in change to a passenger, the penalty cannot be recovered from the company, without proof that he had the authority of the president, directors and treasurer, or some of them. But, is it necessary that this proof should come in any particular form? Will nothing do but a solemn resolution of the directors in full meeting assembled? May it not be inferred from circumstances? Surely, it may. In the present case, the offer was to prove, not only that a large number of small notes was passed upon two persons, in the course of a short time, but that it was the open and notorious custom of (as we understand it) all the ticket agents and conductors employed by the defendants, to issue notes of a similar character. Now, what is the natural presumption from this? May a jury infer that the superior officers of the company knew of the custom and approved it? or must the court, as a matter of law, determine without submitting it to a jury, that all the conductors and agents were habitually violating the orders of their masters, as well as an act of the legislature? It is for the jury to say what is the natural presumption which arises out of such facts, and there is no rule of policy which requires us to make any legal or fictitious presumption on the subject. I will not say what verdict ought to be given on such evidence, but I am very clear, that no man who is not a juror in the case has a right to decide that the president and directors were ignorant, and there-

[The Comm. for use of Lawson v. The Ohio and Penna. R. R. Co.]

fore innocent of a custom which was open, public, and notorious. If a corporation cannot be held responsible for the acts of agents and servants, without proof of express authority beforehand, or distinct ratification afterwards, then the law upon which these defendants are sued, as well as a great many other laws, must remain a dead letter. The managers of a railroad company may cause any statute to be violated by their subordinates, without giving orders which are capable of direct proof. The treasurer takes from the ticket agent all the gold and silver he has collected, and leaves him small bills in place of it: the agent would understand the exact meaning of such a hint. The president passes along the road, and sees all his conductors paying out the forbidden paper, without censure or disapproval: the habit is as sure to be continued, as if he had told them to go on. If these bills had been passed in a few instances, by one or two of the company's servants, it would not be enough. But it seems to have been a general habit for a long time, until it became a notorious thing. The managers ought to be presumed to know at least as much about the conduct of their agents, as was known to everybody else. If they knew of this, and yet suffered it to go on, the agents could not but know that they had the approbation of their superiors; and if they had, the corporation is responsible.

Morris, in his deposition, refers to a list or schedule of the small notes passed by the defendants' agents to him, and in his presence, which list is appended to the deposition. This is objected to as secondary evidence; and so perhaps it might be called, if it were given alone. But the plaintiff's offer is to produce with it the notes themselves, which, it cannot be denied, are the best evidence the nature of the case admits of. But the notes were not shown, when the witness's deposition was taken. This makes no difference, if the jury be satisfied that the notes produced on the trial, and those from which the schedule was made out, are the same. The offer ought not to have been rejected. I am for reversing the judgment.

Judgment reversed, and *venire de novo* awarded.

Lowrie, J.—I concur with my brother, Black, in the results to which he has arrived, on the points discussed by him in his opinion, yet I must confess that I have not felt convinced that there was any valid objection to the competency of Morris as a witness, and therefore do not adopt the process by which his competency is proved.

Knox, J.—I concur in the opinion of my brother, Black, except so far as he admits that Morris was incompetent as a

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

witness, by reason of his conviction for conspiracy. I am not prepared to say that this conviction disqualified him from testifying. I agree, however, that if it did, he was restored to competency by the pardon.

LEWIS, C. J., and WOODWARD, J., dissented.

WOODWARD, J.—Whilst I do not concur in the opinion of the majority in regard to the competency of Morris as a witness, I propose to confine my written dissent to the question which arises upon the rejection of the matters offered to be proved by Davis. If these matters, by whatever witness proved, do not entitle the plaintiff to recover, there is an end of his action, and he is out of court.

It was no part of the offer that the company expressly authorized conductors and ticket agents to pay out the contraband currency, or that they knew it was done, except as knowledge might be infered from the circumstances that the notes were paid out in the cars and ticket offices, and that such payments were the open and notorious custom of the conductors and agents. The objection to this offer was specific—that there was no evidence of precedent authority, or of recognition and ratification on the part of the company, so that it is fair, perhaps necessary, to assume that the plaintiff had no such evidence to offer. The form of the objection would have brought it out, if such evidence existed. The question presented by the record is, then, whether the misdemeanor of the agents committed in the ordinary course of their employment, and for the benefit of the company, but without corporate sanction, is sufficient to charge the company with the statutory penalty? "Every violation of the provisions of this section by any *corporation*," is the language of the enactment which defines corporate liability. Under their charter, the president and managers are the governors of this corporation, and whatever is done by their authority or with their subsequent ratification, which is equivalent to precedent authority, binds the corporation. But in general, the only mode in which a corporation aggregate can act, is through the intervention of agents, and a corporation is liable for the wrongful acts and negligences of its servants and agents, done in the course of their regular employment, on the same ground, in the same manner, and to the same extent that natural persons are. Angell & Ames on Corp. sec. 310; 7 Cranch, 305. A corporation, however, is not responsible for *unauthorized* acts even of its officers, though done *colore officii*,—nor does any presumption of the company's guilt arise from the *wrongful* act of its officer, for while the presumption of law on the one hand is that the officer did no more than his duty,

[The Comm. for use of Lawson v. The Ohio and Penna. R. R. Co.]

the presumption of innocence on the other is that the company did not instruct him to violate the law. *Hazleton Coal Co.* v. *Megargle*, 4 Barr, 329. To fix the liability, it must be shown affirmatively, either that the officers were expressly authorized to do the act—or that it was done *bona fide* in pursuance of a general authority in relation to the subject-matter, or that the act was adopted and ratified by the corporation. Angell & Ames, sec. 309.

The relevancy of the evidence offered and rejected, depends on the application of these general principles to the very peculiar circumstances of the case.

A conspiracy is contrived in Ohio between four men, to betray Pennsylvania corporations into violations of the statute in question, whereby large penalties may accrue to the informer. Instead of attacking the governing officers of the corporation defendant, they tempt the conductors and ticket agents to pay out small notes, which was a public offence on the part of the employees that subjected them individually, for each note passed, to a penalty of $25, and to indictment and punishment as for a misdemeanor. The duties to which the conductors and ticket agents are appointed, are specific and lawful. No authority was ever given to them to receive or pay out small notes, and nothing but ground for an implication of the company's knowledge that they dealt in them, was offered to be proved.

Have the conspirators caught the corporation?

If the case be put on the ordinary ground of principal and agent, leaving out of view the distinctions already adverted to as peculiar to corporations, how will it stand?

If this suit be regarded as a criminal proceeding, the general doctrine is that a principal is not ordinarily liable in a *criminal suit* for the acts or misdeeds of his agent, unless, indeed, he has authorized or co-operated in them.

But the Act of 1850 calls these forfeitures *civil penalties*, and this suit is, undoubtedly, to be treated as a civil action. What, then, is the law of principal and agent in respect to civil remedies for the torts of the agent? It will be found very fully stated by Judge Story, in his work on Agency, at sec. 452. The principal is liable to *third persons* for the frauds and torts of his agent in the course of his employment, although the principal did not authorize or justify, or know of such misconduct, nay, though he even forbade the acts or disapproved of them. The rule, in all such cases, is *respondeat superior*, and it is founded in public policy and convenience, for in no other way could there be any safety to *third persons* in their dealings through the instrumentality of agents. Now be it observed, that this rule is both in reason and authority, a rule for the protection of *third persons*, such as deal with the agent in good faith, who are themselves in-

[The Comm. for use of Lawson *v.* The Ohio and Penna. R. R. Co.]

nocent of any fraud, and who must sustain loss and injury if the principal be not liable for the agent's act.   It has no application where the fraud is practised on the agent.   The perpetrator of the fraud is not the *third person* whose safety and protection this rule contemplates.   He is not the innocent and injured party, in behalf of whom the law will visit the agent's act over on the superior.   If loss results to him from the joint wrong of himself and the agent, the law will not repair it, for in general, where parties are in *pari delicto*, there is no relief for either.   But if profit and advantage, instead of loss, are to result to the perpetrator of the fraud, surely, the law is not to be an instrument in his hands to enable him to reap the fruits of his iniquity.   This distinction was taken, and stated better than I can state it, by Chief Justice .Oakley, in the case *Clark* v. *The Metropolitan Bank*, 3 Duer, 241, a case which strongly resembled the present.   That was an action to recover a statutory penalty for dealing in foreign bank notes.   The Chief Justice said: "It is undoubtedly true that, in many cases, a principal is responsible for the act of his agent, which, although an abuse or excess of authority of the agent, was within the general scope of the business he was employed to transact; but this is only true between the principal and a third person, who, believing, and having a right to believe, that the agent ,was acting within, and not exceeding or abusing his authority, would sustain a loss if the act were not considered as that of the principal.   It is only true where the sole question is, by which of two innocent parties a loss, resulting from the fraud or misconduct of the agent, ought to be borne.   It is plain, however, that no such question arises here.   Here, the person who paid the bank bill in question, knew that the teller violated his duty in receiving it, for we are just as much bound to impute to him a knowledge of the provisions of the statute, as to the teller himself.   And the person on whose behalf the bill was presented to the teller, so far from sustaining a loss, derived a benefit from its reception."   These observations are directly in point, and apply themselves to the case before us.   In that case, the offence consisted in *receiving*, and in this in *paying out* forbidden bank notes; but in both, the agent of the corporation violated the statute, not to the prejudice of an innocent party dealing with him *bona fide*, but at the instance of a party who sought profit and advantage out of the violation to which he tempted the agent.   The present informer is not entitled to the protection of the rule of law he invoked.   It was made for honest men, dealing *bona fide*—not for conspirators against the rights of others.   He knew right well that the agents were violating the statute, for the conspiracy which he had hatched had its foundation in a knowledge of the provisions of the statute.   So far from sustaining any loss by the agent's acts, he sought and created them—created the occasion and' in-

[Fowler v. Sergeant.]

duced their performance, as a source of profit to himself. He was, in a word, the author of the very wrong of which he now complains. Instead of suffering from a fraud, he practised the fraud, with circumstances of great aggravation, and to the insult of the dignity of Pennsylvania.

All this appears from the case as offered in the testimony, and it is manifest that such a party is not in a condition to enforce the principle of *respondeat superior*, which belongs to the relation of principal and agent. And if that principle will not sustain his case and justify the evidence offered, there is no other ground for him to stand on. It is putting his case on its best footing to test it by the law of principal and agent, and if it cannot abide that test, it can endure no other.

To treat it upon the law of corporations, he is met by the rule that there is to be no presumption of corporate guiltiness, any more than an individual is to be presumed guilty, and as he offered no evidence that tended to establish the guilt of the corporation, what he did offer was properly rejected. At most, it could raise only a *presumption* that the agents acted with the knowledge and by the authority of the company, and a complete counterpoise to that is the other *presumption*, that the corporation acted according to law.

On this main and fundamental point, I think the ruling below was right, and I would affirm the judgment; and I am permitted to add, that the Chief Justice concurs with me.